**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **8:05CR233** |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **REPORT AND** |
| ) | |
| **GILBERTO VERDUGO GUTIERREZ,** ) | **RECOMMENDATION** |
| ) | |
| **Defendant.** ) | |

This matter is before the court on the motion to suppress (Filing No. 16), as amended (Filing No. 23), filed by defendant Gilberto Verdugo Gutierrez (Gutierrez). Gutierrez is charged in the Indictment with the distribution and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Gutierrez seeks to suppress any evidence derived from a traffic stop, detention, and subsequent search of Gutierrez's automobile and person on April 19, 2005, by officers of the Seward County Sheriff's Office (SCSO).

An evidentiary hearing was held on Gutierrez's motion on March 6, 2008. Gutierrez was present for the hearing along with his retained counsel, Raul Ayala. The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda. During the hearing, the court heard the testimony of SCSO Deputy William Maddux (Deputy Maddux). The court also received into evidence two videotapes (Exhibits 1 and 2), a citation (Exhibit 101), a report of deposit of fees (Exhibit 102), and a California insurance identification card (Exhibit 103). A transcript of the hearing (TR.) was filed on March 14, 2008 (Filing No. 52).

**FINDINGS OF FACT**

Deputy Maddux was a law enforcement officer in Kansas from 1997 to 2004 and in Nebraska from 2004 to 2006 (TR. 4). Presently, he is on medical leave from his employment with the Kansas Department of Corrections (TR. 55). Before coming to Nebraska, Deputy Maddux was employed by the Kiowa County Sheriff's Department in Kansas as a canine handler, a Drug Abuse Resistance Education (DARE) instructor, and a member of a criminal interdiction task force (TR. 5). Deputy Maddux received criminal

interdiction training at his police academy, seminars through the Kansas Highway Patrol, the Drug Enforcement Administration, the Federal Bureau of Investigation, and the Border Patrol (TR. 7). Deputy Maddux also attended a school in Arizona, Desert Snow, a school specifically targeting highway criminal interdiction and the apprehension of criminals, drug smugglers, and money launderers (TR. 7). At Desert Snow, Deputy Maddux was trained in the detection of hidden compartments in various makes and models of vehicles used for drug smuggling (TR. 8; 14). Further, Deputy Maddux performed as an instructor at Desert Snow at least twelve times while in law enforcement (TR. 9-10).

On April 19, 2005, Deputy Maddox was employed as a Deputy Sheriff with the SCSO with general patrol duties and as a canine officer with the majority of his time spent patrolling the interstate (TR. 5; 17). Deputy Maddux was conducting his duties in uniform and in a marked patrol unit (TR. 16). Deputy Maddux had given a public presentation at a small town on the eastern edge of Seward County and was returning to Seward to finish his shift around 7:30 or 8:00 p.m. (TR. 17-18). Deputy Maddux was westbound on Interstate 80 near the Seward exit when he observed an eastbound vehicle with no front license plates (TR. 18-19). As Deputy Maddux passed the eastbound vehicle, Deputy Maddux did not observe a rear license plate on the vehicle (TR. 19). Deputy Maddux then turned into the grass median and began to follow the vehicle (TR. 20). As Deputy Maddux was attempting to catch up to the vehicle, he saw the vehicle "drift over the left center line, and then I see the vehicle drift back to the right, over the right white fog line, and then back in the lane" (TR. 21). The vehicle did not use its blinkers either time (TR. 22). Apart from the traffic violations, Deputy Maddux was concerned there may be an impaired driver in the vehicle and the vehicle could be a danger to surrounding traffic (TR. 22). Deputy Maddux engaged his patrol vehicle's light bar and conducted a traffic stop of the vehicle (TR. 22-23). The activation of the light bar also activated Deputy Maddux's patrol car's camera (Exhibit 1).

The vehicle, a 1999 Dodge Durango, pulled to a stop on the shoulder of the interstate and Deputy Maddux pulled onto the shoulder behind the Dodge Durango (TR. 23; Exhibit 101). He got out of his patrol vehicle and walked to the passenger side of the Dodge Durango and spoke to the two occupants (TR. 23). The driver, Mr. Lapizco

(Lapizco), did not speak or understand English, but the passenger, Gutierrez, did (TR. 24). Deputy Maddux explained to Gutierrez the reason for the stop and told him that a warning would be issued (TR. 24-25). Lapizco furnished a Mexican driver's license and an electoral card (TR. 25). Gutierrez provided a California driver's license and some vehicle identification papers (TR. 26). Since Gutierrez was speaking fluent English, Deputy Maddux asked Gutierrez to come back and sit in the patrol car so he could answer any questions Deputy Maddux had while paperwork was being completed (TR. 26). Gutierrez agreed and walked back to the patrol car with Deputy Maddux (TR. 26). Deputy Maddux had to move some things from the front seat of the patrol car to make room for Gutierrez (TR. 27). Deputy Maddux's canine was in a cage in the back seat area. Deputy Maddux began writing out a warning to Lapizco for the traffic violations and he asked Gutierrez about the Dodge Durango (TR. 27). Gutierrez told Deputy Maddux that the vehicle was purchased recently (TR. 27). Deputy Maddux asked Gutierrez what brought Gutierrez and Lapizco to Nebraska (TR. 27). Gutierrez said he and Lapizco were on their way to visit some of Lapizco's family in Omaha for a few days (TR. 28). Gutierrez said Lapizco came up from Mexico and met Gutierrez in California before they started out for Omaha (TR. 28). Gutierrez said the Dodge Durango was his uncle's car and it had a salvage title which his uncle was trying to get registered in Gutierrez's name (TR. 28-29). Deputy Maddux asked Gutierrez if Deputy Maddux could use Gutierrez's address for the warning since he couldn't read the Mexican address on Lipizco's Mexican driver's license (TR. 29-30). Gutierrez said that would be fine (TR. 30). Deputy Maddux briefly left his patrol vehicle to walk to the Dodge Durango to record a VIN number from the front windshield and the driver's door (Exhibit 1). Deputy Maddux gave all the documents back to Gutierrez, gave the warning citation to Gutierrez, and told Gutierrez that Gutierrez was free to go (TR. 30).

      As Gutierrez started to open the door to the patrol car to get out, Deputy Maddux asked Gutierrez if Deputy Maddux could ask Gutierrez some questions (TR. 30). Gutierrez said "yeah" or "yes" and shut the door (TR. 31). Deputy Maddux asked Gutierrez if there were any drugs in the vehicle, marihuana, cocaine, methamphetamine, or weapons (TR. 31; Exhibit 1). Gutierrez said no, and Deputy Maddux asked Gutierrez if Deputy Maddux could search the vehicle (TR. 31). Gutierrez said "no problem" (TR. 31; Exhibit 1). Deputy

Maddux asked Gutierrez to remain in the patrol vehicle and Deputy Maddux walked to the driver's side of the Dodge Durango and motioned for Lapizco to get out of the vehicle (TR. 32-34). After Lapizco got out of the Dodge Durango, Deputy Maddux performed a quick pat down search of Lapizco and directed him to stand by a tree on the side of the roadway away from the Dodge Durango (Exhibit 1).

Deputy Maddux first searched the interior of the Dodge Durango (TR. 40). He found three cell phones in the Dodge Durango which he found suspicious as being consistent with drug smugglers (TR. 40). Deputy Maddux started at the front passenger door and worked his way back and up to the driver's side of the vehicle (TR. 42). As he progressed, Deputy Maddux removed items from the Dodge Durango and lifted the rear door (Exhibit 1). While Deputy Maddux was checking the back seat area of the Dodge Durango, Gutierrez was heard on the tape to say "No" and "Sir" when Deputy Maddux was pulling part of the back seat panel away from the wall and shining a flashlight in the area (Exhibit 1). Other than being overheard on the tape, Gutierrez made no other effort to gain Deputy Maddux's attention (Exhibit 1). Following the search of the interior of the Dodge Durango, Deputy Maddux opened the hood of the Durango and detected a hidden manifold compartment in the vehicle (TR. 42-45). Deputy Maddux then returned to his patrol vehicle and retrieved his Nextel cell phone (TR. 45). Deputy Maddux used the cell phone and contacted Trooper David Frye with the Nebraska State Patrol in Lincoln, Nebraska (TR. 45-46). Deputy Maddux walked to the front of the Dodge Durango and explained to Trooper Frye the configuration of the manifold in the engine compartment (TR. 46). Trooper Frye told Deputy Maddux that Trooper Frye was on his way from Lincoln to the scene at the side of the Interstate which would take about twenty minutes (TR. 46).

Deputy Maddux returned to his patrol car and talked with Gutierrez (TR. 47). Deputy Maddux's canine was continuing to bark and Deputy Maddux attempted to quiet the dog (TR. 47). Gutierrez was very anxious (TR. 47). Deputy Maddux described Gutierrez as follows:

> At this point he was kind of – he was pretty antsy. It appeared to me he wanted to get out of the car and he wanted to leave at this point, because he said something to me at one point about, you know, you've had me here for thirty minutes

> searching my vehicle. And I just told him I appreciated his cooperation and I would try to get him out of here as soon as possible.

(TR. 47). The tape reflects the dog barking in the back of Deputy Maddux's patrol car which was irritating Gutierrez along with the wait for Trooper Frye (Exhibit 1). Deputy Maddux required Gutierrez to remain in the patrol vehicle rather than have him wander about outside, and Gutierrez remained in Deputy Maddux's patrol car until Trooper Frye arrived (TR. 48-49; Exhibit 1). When Trooper Frye arrived, he parked his patrol vehicle behind Deputy Maddux's patrol vehicle, and he walked with Deputy Maddux to the front of the Dodge Durango (TR. 49). There Deputy Maddux pointed out the hidden engine compartment (TR. 49). Trooper Frye agreed with Deputy Maddux on the hidden compartment, whereupon Deputy Maddux returned to his patrol vehicle, directed Gutierrez out of the vehicle, and placed Gutierrez in handcuffs, told Gutierrez he was not under arrest but not free to leave, and placed Gutierrez in Trooper Frye's patrol vehicle (TR. 50; Exhibit 1). Lapizco was placed in handcuffs and taken back to Trooper Frye's patrol vehicle (TR. 51). Trooper Frye obtained a drill from his patrol vehicle and drilled a hole in the sheet metal of the engine compartment of the Dodge Durango (TR. 51). When the drill bit was pulled out, there was green cellophane material on the drill bit along with a white powdery substance (TR. 51). Deputy Maddux called his superiors and asked for a tow truck to come to the scene (TR. 51-52). While waiting for the tow truck, Trooper Frye read Gutierrez his *Miranda* rights and attempted to get Gutierrez to cooperate with a controlled delivery of the cocaine found in the engine compartment (TR. 52-54). The Dodge Durango was towed to the tow yard in Seward where the manifold compartment in the Dodge Durango was disassembled and where cocaine was retrieved (TR. 55).

## LEGAL ANALYSIS

### A.   Traffic Stop

Gutierrez argues the stop of the Dodge Durango was without a warrant, without probable cause and without a reasonable suspicion of any criminal activity. Gutierrez contends the stop was impermissibly based on the race of the vehicle's occupants. The

government argues the traffic stop was reasonable, based upon Deputy Maddux's initial observation of the Dodge Durango, which did not have license plates.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "Because a traffic stop is a seizure within the meaning of the Fourth Amendment, it must be reasonable to pass constitutional muster." ***United States v. Wright***, 512 F.3d 466, 471 (8th Cir. 2008) (**citing *Delaware v. Prouse***, 440 U.S. 648, 653 (1979) and ***Whren v. United States***, 517 U.S. 806, 810 (1996)). "To be reasonable, a traffic stop must be supported by, at a minimum, 'a reasonable, articulable suspicion that criminal activity' is occurring." ***United States v. Pappas***, 452 F.3d 767, 771 (8th Cir. 2006) (citation omitted). "Any traffic violation, however minor, provides probable cause for a traffic stop." ***Wright***, 512 F.3d at 471 (quotation omitted). Furthermore, "[a]n otherwise constitutional traffic stop is not invalidated by the fact that it was mere pretext for a narcotics search." ***Id.*** Failure to prominently display licence plates on a registered motor vehicle is a violation of Nebraska statute. **See** Neb. Rev. Stat. § 60-3,100. The other conduct observed by Deputy Maddux, specifically driving over the center line and driving onto the shoulder of the road are also violations of Nebraska statute. **See** Neb. Rev. Stat. §§ 60-6,131 and 60-6,142.

The court finds Deputy Maddux had an objectively reasonable basis for believing the Dodge Durango was in violation of Nebraska statutes and had breached any of three different traffic laws at the time of the stop. Initially, Deputy Maddux did not see a license plate on the vehicle. He followed the vehicle to verify no license plate was displayed and observed additional traffic violations. Under the circumstances, Deputy Maddux could have reasonably believed the driver was impaired. **See *United States v. Mallari***, 334 F.3d 765, 767 (8th Cir. 2003); **see also *Nebraska v. Thomte***, 413 N.W.2d 916, 919 (Neb. 1987) (holding a vehicle weaving twice in its own lane of traffic over the course of one mile provides reasonable suspicion for an investigation regarding the driver's condition in operating the weaving vehicle). Based on the officer's observance of one or more traffic violations and the possibility the driver may be impaired, Deputy Murphy had probable

cause to stop the driver of the Dodge Durango. There was no evidence presented that Deputy Murphy stopped the Dodge Durango based on any unlawful motive.

**B.     Initial Detention and Search**

When an officer makes a routine traffic stop, "the officer [is] entitled to conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop." *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000) (per curiam). "If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007) (**quoting** *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995)).

The court finds, based on the circumstances of this case, the officer had legal justification to first stop and then briefly detain the occupants of the vehicle while the officer conducted a brief investigation and wrote the warning ticket. The traffic stop was completed when Deputy Maddux asked the defendant for permission to search the vehicle. However, the defendant immediately consented to answer additionally questions and gave permission to search.

The warrantless search of a vehicle may be constitutional pursuant to a number of exceptions to the warrant requirement including as a search incident to arrest (*New York v. Belton*, 453 U.S. 454, 460 (1981)) and consent to search (*United States v. Welerford*, 356 F.3d 932 (8th Cir. 2004)). The government has the burden of proving that an exception to the warrant requirement applies. *United States. v. Bruton*, 647 F.2d 818, 829 (8th Cir. 1981); **see** *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003). The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. *United States v. Welerford*, 356 F.3d 932, 936 (8th Cir. 2004). The court can also look at environmental factors including, the

period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred. *Id.*

In this case, there is no evidence the defendant was under the influence of alcohol or drugs at the time and he was not placed in handcuffs or threatened. Only one officer was present during the initial questions and request to search. The defendant was told he was free to leave. The defendant was detained only a matter of minutes before Deputy Maddux asked for consent to search. Based on these factors, the court finds the defendant's consent to search was knowingly and voluntarily given.

### C.     Revocation

The Eighth Circuit has held "'the typical reasonable person' would understand a suspect's general consent to search a vehicle for drugs to include consent to open unlocked containers within the vehicle, access apparently false compartments, and 'search any part of the truck where [drugs] might be stored.'" **United States v. Gallardo**, 495 F.3d 982, 990 (8th Cir. 2007) (internal citations omitted) (noting opening the hood and examining the engine compartment does not exceed an unqualified consent to search). In this case, the defendant did not qualify or limit the consent to search. Additionally, Deputy Maddux was experienced in locating hidden compartments in vehicles, to include the use of the engine compartment.

The defendant argues he attempted to revoke his consent or limit the search when he said, "no" and/or "sir" upon observing Deputy Maddux's search progress beyond a mere cursory visual inspection. **See *United States v. Sanders***, 424 F.3d 768, 774 (8th Cir. 2005) ("Once given, consent to search may be withdrawn . . . by unequivocal act or statement."). The defendant made his statements from his seated position in the police vehicle. The defendant's conduct was insufficient to revoke his earlier unqualified consent. Deputy Maddux did not have a duty to ensure the defendant an ongoing opportunity to revoke his consent or belatedly limit the scope of the search. **See *Gallardo***, 495 F.3d at

990. Similar to the facts in *Gallardo*, the defendant here was uncuffed, seated in the patrol vehicle, which was parked behind the vehicle being searched. *Id.* There is no evidence the defendant attempted to attract the attention of Deputy Maddux. Although, the defendant said, "no" and "sir," the defendant did not raise his voice, attempt to exit the vehicle, roll down a window, honk the horn, or make any other gesture to gain attention. The defendant was under some obligation to make his intent to withdraw consent known to Deputy Maddux. **See** *id.* Failure of the defendant to do so does not render Deputy Maddux's conduct unconstitutional.

After Deputy Maddux had detected the hidden compartment, Deputy Maddux returned to his patrol car and talked with Gutierrez. Gutierrez clearly and unequivocally attempted to cease the consensual encounter. However, at that time, Deputy Maddux had legal justification for continued detention of Gutierrez and further search of the Durango.

**D.   Statements**

The touchstone for the admissibility of a defendant's statements is voluntariness. ***Brown v. Mississippi***, 297 U.S. 278, 279 (1936). The court must look to the totality of circumstances in determining whether or not the statements were voluntary. ***Mincey v. Arizona***, 437 U.S. 385, 401 (1978); ***Colorado v. Connelly***, 479 U.S. 157 (1986); ***Schneckloth v. Bustamonte***, 412 U.S. 218 (1973). In this case, Gutierrez was advised of his constitutional rights pursuant to ***Miranda v. Arizona***, 384 U.S. 436 (1966). There is no evidence Gutierrez did not understand the advice of rights. There is evidence he was alert and coherent. Even though Gutierrez was advised of his *Miranda* rights, the court must examine the conduct of the law enforcement officials to determine whether or not there was an overreaching by law enforcement officials amounting to coercive police activity. Coercive police conduct will render a confession inadmissible. ***Blackburn v. Alabama***, 361 U.S. 199 (1960). In determining whether a defendant made statements voluntarily, the court must determine if the accused was coerced or his will was overborne and his capacity for self-determination critically impaired. ***United States v. Santos-Garcia***, 313 F.3d 1073, 1079 (8th Cir. 2002). The court must consider the totality of the circumstances, including the specific interrogation tactics employed, the details of the

interrogation, and the characteristics of the accused. **Schneckloth v. Bustamonte**, 412 U.S. 218, 225-26 (1973). Coercive police pressure is a predicate to the finding that the confession is not voluntary and violates the accused's due process rights. **Colorado v. Connelly**, 479 U.S. 157, 167 (1986). However, any police questioning has coercive aspects to it simply by reason of the confrontation. **See Santos-Garcia**, 313 F.3d at 1079 ("To state the obvious, 'interrogation of a suspect will involve some pressure because its purpose is to elicit a confession.'"). The police officer is part of the law enforcement system that will cause a charge to be made against a suspect. The questioning by a police officer, while uncomfortable, is not coercive *per se*. **See Oregon v. Mathiason**, 429 U.S. 492, 495 (1977).

Gutierrez contends he did not make statements voluntarily under the circumstances based on the search, his placement in the police vehicle and the denial of his initial request to use the bathroom. The court finds no support for Gutierrez's argument. Although his initial request to use the bathroom was denied, Gutierrez was allowed to relieve himself within a reasonable period of time. Additionally, the evidence shows Gutierrez was not subject to any improper police tactics, threats or coercion to garner his agreement to make statements to the officers. The court finds Gutierrez's will was not overborne and he made statements voluntarily. Therefore, the motion to suppress the evidence collected as a result of the April 19, 2005 traffic stop should be denied. Upon consideration,

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Gutierrez's motion and amended motion to suppress (Filing Nos. 16 and 23) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such

objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 6th day of May, 2008.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge